Could we call the final case today, please? Dalby v. State Farm. Will the attorneys presenting argument today please approach, introduce yourselves for the record, and spell your last names, please. Good morning. I'm Grace Wine, W-E-I-N. Good morning. Jim Gaughan on behalf of State Farm. Gaughan is G-A-U-G-H-A-N. Okay, Ms. Wine and Mr. Gaughan, nice to see you again. Thank you for your letter briefs. As you can see, we had a little problem with our record. When we came back up the second time, you made a perfectly reasonable request that we judicially notice the record. I did not, and it's my fault. I didn't appreciate we were transitioning to electronic records. Even still, I would have hoped that the record would have looked exactly the same electronically as it did in paper. As you can tell, it didn't. So I appreciate you. We had to burden you a little bit to walk us through some of these issues so we could find some of this material. So I do appreciate what you did. We typically allocate 15 minutes a side. We can be a little bit flexible with this. There's a lot to talk about today. Ms. Wine, I assume you'd like to reserve a few minutes for a bubble? I will. Okay. Please speak into the microphones. They're not for amplification but for recording. I just want to make sure we have a good transcript. And with that, Ms. Wine, you have the floor. If the Court please. There are multiple issues here. I'm going to start with the issue of what we believe is the failure of the trial court to comply with the court's mandate. And I will conclude ultimately with the conclusion that regardless of how procedurally we look at it, State Farm's motion was, for summary judgment, was fairly flawed under 191. And I say Robodeau, Robodeau my French, is not so great. But the Robodeau v. Oliphant case because documents were not attached to summary judgments which were required. And that's where I will end. Let me ask you a question from the outset. Yes, sir. In this scheme that you allege, are you saying, at least with the four defendants, I know you're trying for a class action, are you saying that these defendants were never served or that they were served improperly? There's a difference, right? I know you're saying it was improper, skip the sheriff, didn't do the special process server correctly, but did these people get served, Selby, Young, et cetera? I will tell you, I do disagree just because service is service. It's either correct or not and anything else doesn't count. But I will also say that each one of these plaintiffs maintained that they were in fact. You're really talking about were they legally served or were they factually notified, factually served? And every one of them said no. Every one of them denied that they were served. Every one of them said that. So in answer to that question, the answer is both factually and legally they claimed that they were not. And I could go through each one of them. I mean, just generally, Young, he was hospitalized during the period of time and lived in a home that was owned by his brother who met the same demographics that he did. So he said he was never served. He didn't get served until the garnishment. I'm just trying to understand if this is a situation where you're not even trying to serve, you know, which sometimes happens. People, there are people who, of course, you're not supposed to do it, but, you know, they won't serve at all and then go and lie to the court and say, we served them so they can get default judgments. And I couldn't tell if that's what you were alleging or if you were alleging just that Ricky Dixon was the wrong guy to be doing it. Well, both. I mean, Ricky Dixon wasn't licensed to do it and they bypassed the statute. Right. But these people also said they were not in fact served. So the difference between legally and factually. They were not in fact. Every one of them said they were not in fact served. Okay. So let me ask you this. Abuse of process. Yes, sir. Tell me the facts that you have to support the allegations that you have in the complaint to support a claim for abuse of process. The allegations in the complaint support abuse of process. Abuse of process are two. It's a very simple cause of action. Two things. You have to have some abuse of process. Right. And you have to have some improper motive in the abuse of the process. So you've alleged an abuse of the service of summons and you've alleged an ulterior motive. So I guess what I should have asked you is what facts do you have? Have you alleged to show vicarious liability of State Farm? The vicarious liability of State Farm on the abuse of process. We have alleged State Farm knew what was happening. We've alleged that they were getting reports of what was happening. State Farm, I think very importantly here, is the law imputes the knowledge of the litigation attorney to the litigant. So the litigant can't say, I didn't know what my lawyer was doing in the course of litigation. That's important because the Holabird and Root and Horowitz case was a non-litigation case. This was in litigation. And what happens in litigation is imputed to the client. So State Farm had legal imputed knowledge. State Farm hired the lawyer. State Farm ratified the behavior. How? Well, once they benefited and utilized all of these judgments, not just in the four but others, which that goes into the discovery on all the others. They were routinely getting these default judgments which were improper. But getting a benefit all by itself isn't ratification, right? You have to know that something is being done that's wrong. Well, ratification is the timeline. I mean, the ratification is if you didn't know, then when you did know, you ratified it. So ratification comes into play if they didn't have knowledge, which we say was legally imputed to them. But they're saying, well, we didn't know. But even that, well, we're getting back to the allegations of the complaint. The allegations of the complaint is that they knew there were things different with O'Day than other lawyers that did subrogation. They knew how subrogation was supposed to be done. They were doing audits. They were physically there. They were paying for sheriff's fees. But they had no ‑‑ there were no sheriff's returns on any of these cases. Who was paying sheriff's fees? State Farm was paying sheriff's fees to O'Day. So State Farm fronted those costs? Well, State Farm got billed for those costs and paid it. So O'Day would ‑‑ Oh, okay, okay. So State Farm gets a bill for $60. O'Day never incurred that expense. He just sent them a bill for $60 and said it was for sheriff's fees. Okay. But it didn't place, though. He was just pocketing that money. And State Farm knew that. What's the basis that they knew that? Excuse me. I'm sorry? What was the basis that they knew that? They were billed and they paid the bill. What establishes that they knew that the sheriff was never used for service? Well, the records themselves would indicate that the sheriffs were never served. And O'Day, during this period of time, had 2,000 cases where every single time he used a process server after they were billed for the sheriff. That wasn't used in all the other cases. And he wasn't their only lawyer in this. It wasn't just one individual client. They had a whole lot of lawyers. But with O'Day, they had 2,000 cases where they're getting billed for a sheriff and every single time they're getting billed for a process server, too. Somehow, on these 2,000 cases, none of those services ever were completed by the sheriff. So State Farm knew or should have known. State Farm had adjusters that were on these files, on each and every one of them. So State Farm knows they're getting billed for sheriff's fees, and somehow, on 2,000 cases, the sheriff never is successful. Never. I mean, that in itself is something that State Farm would be charged with knowing. Mr. O'Day's wife worked in the claims department of State Farm during this period of time. They were married, I think, in 2006. This, what we call a scheme, occurs in 2007. Prior to 2006, State Farm was or O'Day was routinely placing things with the sheriff. Something happens in 2007, all of a sudden they're not being placed with the sheriff. By mid-August, he's not placing anything, and it runs up to 2000. So something happened in all of that time, and that knowledge is imputable to State Farm because he was their litigation attorney. We have alleged that State Farm did auditing of his files, both physical auditing, meaning they checked the file, well, where's the return of service? It's not in there because there wasn't a return of service placed to the sheriff. So they had that knowledge. For State Farm to say, well, factually, we really didn't know, they can't be intentionally ignorant, intentionally not understanding what is in front of them, which is getting billed for 2,000 cases for sheriffs, and not one of them is successful in Cook County. There are other things alleged in the amended complaint. We've alleged the audits. We've alleged the physical files, the sheriff's fees, the service themselves, the communications with O'Day on the files, and no service. And the ratification comes in if one believes that in all of this they're just willfully negligent, they don't know what's going on. They certainly at some point do know what's going on, and they don't disavow. They don't say when they're faced with this complaint, for example, they don't say, my goodness, we had no idea what was happening. Look at this. We have this lawyer that's sort of out there, and he's doing things that are improper, and we disavow it. We do not want this to happen. We do not agree that this is acceptable. And consequently, we are going to fix this. We're going to make sure he doesn't do it anymore. We're going to go back. We're going to fix what he's done. That's where the ratification portion comes in, which is Horowitz. If you really believe they didn't know, despite what was imputed knowledge to them, they ratified it because it was brought to their attention. And one of these plaintiffs, a shiny plaintiff, that occurred after this lawsuit. After this lawsuit was brought, State Farm certainly knew that they had some issue with O'Day, and still he's out there garnishing and pulling driver's license from this young woman who was in college at the time, has no idea any of this has happened, and she's the one. So in that abusive process claim, and did you pronounce it shy-vay? Shy-vay, yes. Shy-vay, okay. Polk is easier, right? It is. We're all happy she got married. Because I know that one also has a specific claim about it being barred by the statute of limitations. Exactly. But are you also alleging, but putting that aside, just abusive process, you're also alleging the same abusive process with regard to shy-vay? Yes. Okay. Yes, there was. She had literally no idea. She doesn't know until her license is suspended and her father gets notified of that when she's calling from college going, what happened, and he starts going backward. And State Farm certainly knew about O'Day's questionable conduct by that time. And yet that still proceeds. While this lawsuit is pending, shy-vay occurs, and they won't release her driver's license, they won't release the garnishment, they won't release the citation, despite everything, and they just continue to plow ahead. That is the ratification. They knew. And again, so under this, the law imputed knowledge to them, but if you're looking about actual factual knowledge, certainly once they had the lawsuit, they knew and they have done nothing. They entered a joint. In fact, they did the opposite of repudiating him. They wrapped their arms around him with a joint legal defense and they protected him and going forward have continued to do that for all this time. So if we're off that, so the mandate. I would like to talk about the mandate. The mandate is of concern to me as a lawyer. It's of more concern, I think, to this court because this court's mandate has to mean something and it doesn't mean sort of kind of maybe if we want to follow it, we'll follow it. It means what it says. This court's mandate was one sentence, vacated in part, affirmed in part, remanded with instruction. The remand on instructions had nothing to do with the vacater. Okay. What did the judge do wrong? Okay. He refused to acknowledge that this court had vacated the dispositive orders dismissing State Farm from the case. In other words, the orders on the abuse of process claims and the motion for summary judgment. He was required to acknowledge that, and whether he put it in another order or not, it becomes less significant than whether he understood what the law was that applied and the procedural posture of the case. Well, he just did the in-camera hearing. He found no new informational subject to disclosure, and he just reentered judgment on those two orders, right? He could have gone back and said, I'm going to dig into what Judge Garcia did. I'm going to reconsider it. They could have reconsidered it, but we didn't tell him he had to. And he could have just, you know, we didn't know that the judge was going to retire when he remanded it. Presumably, most judges in that situation would just go back to their previous orders and just reenter them if they found no new information. But nothing requires them to do it. They can reconsider if they wish to. They kind of can do either one, right? So Judge Mitchell decided to just, after finding no new information, just not revisit those rulings and just reenter them, right? That is what he did, and that was incorrect. Why? Because he had no ability to reinstate orders that did not exist. And that's what he did. He said they'll stand. He did not make any de novo review of the motion for summary judgment or the abusive process, and significantly, the record does not indicate that he ever even looked at them. So he became the appellate court to this appellate court, saying, well, you said vacated, but I don't consider them vacated. I consider that I'm going to decide whether I will continue to have them vacated or not. And it made a difference procedurally. When the appellate court vacated the judgment, did it also vacate the pending motion for summary judgment that the court had before it? It vacated the rulings. So the court, actually, the court still had that motion before it. It was not pending before it. It was in the record. There's no question that State Farm, because you did say you vacated them. Then in the order, you also said it was not on the merits, which would mean it was without prejudice. So State Farm could have renoticed it. Had the trial judge said it? I think we made it pretty clear, I hope we made it pretty clear, that we were remanding it. We were vacating and remanding because we didn't know what the outcome of this in-camera hearing was going to be. And you had made much of that interrogatory 12, right? You were saying there might be something important there. And so we said, okay, well, let's not rule on these right now because there might be something. And you might want to add to your complaint. You might want to amend your complaint. You might want to bolster your opposition to summary judgment. And that's the only reason we did it. And so when the judge said there's no new facts, he said, I see no reason to do anything but just reenter judgment on this. Okay. I would go back to say that there was another part of your order which talked about the 500 cases that State Farm had determined that O'Day had claimed that State Farm determined were subject to the class. This court also said this is something that also may be utilized to do an amended complaint or to argue against any subsequently postured motions. The plaintiffs never had the opportunity to do that. It makes a difference whether the orders were vacated and now in the record you've got a motion for summary judgment that's outstanding and a motion to dismiss which is outstanding, but then not noticed. That's nothing other than any other motion that's in a record where somebody doesn't bring it up and say, okay. And respectfully, the trial court can get to what he looked at. But even if you assume for the moment that what he looked at was proper and how he looked at it proper and all of that, all he could do with that is say, I've looked at this. I've looked at the privilege log. There's nothing new. Now where are we? Then State Farm, oh, excuse me, Your Honor, I would like to re-notice the motion. Then plaintiff's counsel, okay, Your Honor, now that they're re-noticing the motion, I would like to bring forth all of this other evidence that we've garnered in the last two years to fight the motion for summary judgment and the abusive process. We were never given that opportunity. This truncated form of just going to this and saying, well, there's nothing new here that I can see, which is another thing. This was not the same trial judge. So there's the question, how did this trial judge know what was new? I mean, new to him? New at this time? New, what would have been new to me or new back when it was done? Those are very different things. And when we were here before and State Farm's counsel said these meetings were fact-finding missions and then the trial judge says there aren't any new facts, that seems to be inconsistent. So the meetings were supposed to be fact-finding, but there are no new facts. Well, there must have been some facts if those two things are consistent. I think you're talking about Judge Mitchell. What Judge Mitchell said was these conversations are not protected by the common interest exception to the waiver rule, that they were joint communications about the case, defense of the case. I don't think he said there was nothing new. He said that the stuff they're discussing is protected. Actually, he did. In his order of, this will test my memory a little bit, the July, I believe, order of 2018, before he made the final order, he said there are no new facts. And therefore. Right. I mean, there's no new information. No new facts. He said there's no new facts. Right. And then we also had concerns about the way in which he did it and the substance of what he looked at. It was an ex parte communication. State Farm doesn't deny that it was. State Farm just says, well, that's what this Court told us to do. I don't think the Court did that because anything the Court would have ordered necessarily could not have gone in that direction. And we know of multiple, multiple communications, and the record is very clear that December 9th was not the first communication between State Farm and O'Day. The record is very clear on that. They had prior communications. They had entered a joint legal defense before the December 9th. So what State Farm did was, aside from the manner in which they provide this affidavit, they proceeded past the timeline. So they don't start with the first communication, where I believe the record indicates the real fact finding was done. They move on to this apparent strategy session. And by the way, I point out, I haven't seen it. I don't know what they provided to judgment. So I presume the Court has seen it. It's in the record. I have not seen it. I don't know what, you know, kind of arguing in a vacuum there. I understand that. But clearly, that communication was not the initial communication of the fact finding information. That was done earlier on with O'Day, and then they decided to enter into the joint defense agreement. Then they had the strategy sessions. Now that we know we're all in the same circle of wagons here, we're going to go forward. And that's what they disposed. They didn't dispose the things that really would have disposed effects. What did O'Day tell them? If you believe, if you believe that State Farm didn't know anything about what this lawyer was doing, he's just an errant lawyer out there, and you believe that, there's a point where State Farm calls him in and says, what the devil are you doing? We're faced with this complaint. He says you're not doing the shareouts. What are you doing? That occurs sometime before December 9th, and that results in their joint legal defense. Let me ask you a couple of more specific procedural, mundane questions. Okay. The monthly status reports? Yes. You have them now? I do have them. I got them from O'Day while the appeal with State Farm was pending. You didn't get them at the time of summary judgment? I did not. Okay. But did you move to compel them at the time of summary judgment? I don't think you did, but I'm not sure, so you tell me. No, I think you're right. From the very technical standpoint, I would say that they were all kind of enveloped in this whole issue of we still need information on this. And so there wasn't. There was originally motion to compel, and then Judge Garcia said, well, wait a minute, let's take a look at this, and we got on the joint legal defense. And then he ultimately said, when I brought another motion, he said, well, after the third amended complaint was filed and they moved for summary judgment, and he specifically said, and that's in the transcript, he said, well, what do you need? And I started to tell him the things I needed, and he said, well, no, I'm just talking about what you need right now for this thing, not the summary judgment, but right now I'm going to limit you to tell me right now what you need. And that's when I said, well, I need the invoices from O'Day. I mean, and that's when I. And do you have those now? I do have the invoices from O'Day now, but that, again, I got after. Okay. Well, I got the four invoices from the named plaintiffs. That I originally got. I got the invoices that demonstrated the scheme and the overall pattern of this abusive process after. Okay. What about the claim files and the activity logs in the claim files? I. Do you have redacted versions of those? I got redacted versions of State Farm's claim files. Of those four? Of those four. Nothing else and the redacted versions. So, and I believe the activity logs, although I'll certainly defer to Mr. Ghan on this, the activity logs are parts of what they know. That's, but nothing separate from that. So, I got a printout of the State Farm what adjusters were getting. But redacted? It was absolutely redacted. Okay. Yes. And I can ask Mr. Ghan more about that, but what were the, what were the, do you have any sense from the privilege log of what was redacted? I mean, are we talking about redacting social security numbers and policy numbers? No. Or are we talking about redacting substantive, I don't think we have them in the record. If we have, I have not seen them. But are we talking about whole communication blocks between O'Day and State Farm that are just blacked out? Yes. I got, yes. I got printouts from computers, which would be what a normal adjuster would look like. What's the latest thing that's happened in the case? You know, somebody sent a bill, somebody paid a bill, a complaint was filed, somebody filed, whatever. An adjuster evaluating a case. It looked, frankly, like pretty much like a claim file that I would see. Yeah, you can handle complaints, right? Right. I do defense work. So in that, what I got looked like a regular defense, insurance defense claim file, but there were whole things that were just redacted. Information from just blacked out. So I don't know. It wasn't just, for example, insurance policy number blacked out or his date of birth blacked out. No, it was not that. It was whole information in the privilege log that was blacked out. And the same with O'Day's legal files. You know, we got a redacted form of the legal files, both of which come into play. The legal files? Yes. What does that mean? O'Day's. Well, I'm just hearing all these terms of art from the briefs, and we asked you some of them in the letter brief request. No one ever said the legal files. Is that the claim file materials? No, those were O'Day's files. Jim O'Day, the lawyers. Okay. Files. So file jackets, because the jackets we got. We haven't been hearing about that in the briefs, though, right? That's not been a source of light. It was mentioned in the briefs as part of the objection under Robidoux versus Oliphant saying that O'Day did not. His was based on, okay, so it came into play there. But that was also redacted. Okay. Do you have those now? Unredacted, yes. You mean redacted, don't you? I'm sorry. No, that's okay. Yes. Okay. Yes, I have. What about the 2008 audit? Do you have that? I do not have that. I've never seen that. And they were supposedly, according to the contract, auditing at least every two years, which would mean there would be multiple other audits, and they would have had supplemental obligations under that, and we have not seen any of the audits. And you've deposed Dorsch and Pisanco? Yes. Mr. Pisanco and Mr. Dorsch have ultimately been deposed. Mr. Dorsch, yes, it took a bit. He is the witness that they claimed had moved permanently to Ireland. And the week before, I had been sitting across from him at an arbitration hearing, and I said, excuse me, I beg to differ. The man is standing in the courthouse today. He's not in Ireland. But ultimately, I did get Mr. Dorsch's deposition, but not before. They claimed he was in Ireland. So that would bring us again, of course, to the Robodeaux Oliphant, and this Court's question about what I didn't get or couldn't have gotten. And I do – it is not wasted on me the irony of saying I didn't get what I needed to respond to the summary judgment, but it doesn't matter because the summary judgment was failed. I do understand the irony of that, but the fact of the matter is that's true. If the plaintiffs had done nothing in response to that – those motions for summary judgment, the motions for summary judgment under the law had to be denied. They did not include all of the documents upon which the affidavits relied. The affidavits themselves were – which I talked in the brief about how inadequate the affidavits themselves were, but you don't even have to go that far. You don't have to consider whether I had everything I needed because you look at that and say, where are the claim files attached to this motion? They're not. Where are the legal files attached to the motion? They're not. And Mr. McGann and Mr. O'Day had both claimed that these were the basis for their affidavits. They weren't attached. They're not there. Robodeaux is a very strong case law. It just – it just is. It has to be attached, and they weren't. I would also point out one other thing. Mr. O'Day's deposition was not attached to the motion. It is in the record. It was attached to our reply. Mr. O'Day's credibility was seriously – seriously compromised, seriously questioned. Without saying anything more about him directly, once a – once the court on a motion for summary judgment has to look to the credibility of any of the affidavits, the summary judgment fails because that becomes a question of fact or a trier of fact, and it cannot be decided on motion for summary judgment. If you have to look at, is this guy telling us the truth, and there's question about that, the veracity, and there clearly was. I mean, he sat in a deposition with me sitting there with the four invoices from the four plaintiff's cases, and I said, you know, did you bill for shares? No, I didn't. Well, you know, what is this? It's a share. Oh, that's a fax. That really meant for a fax, and I'm sure the court knows, you know, his assistant says, oh, no, we never billed for a fax, and their contract didn't allow for – it was just flat out being surprised that I had the invoices is what happened to him, and that was the answer that he gave. Once his credibility was attacked like that, the summary judgment was improper. Thank you. Thank you. We'll give you a few minutes for rebuttal. Thank you. Mr. Donner. May it please the Court. Jim Donner on behalf of State Farm. Your Honors, I'd like to address three issues. The first, that plaintiffs have failed to establish a vicarious liability claim against State Farm. Second, that plaintiffs have offered no factual support for their conspiracy claim. And then third, a series of procedural roadblocks that plaintiffs have raised to suggest that somehow or another they should be entitled to more discovery in this case. So let's start with the vicarious liability claim. Plaintiffs are attempting to hold State Farm liable for the professional judgments of Attorney O'Day. And as the Supreme Court found in the Horowitz matter, a client is not vicariously liable for the professional judgments of their attorney unless the client specifically directs, controls, authorizes, or ratifies – a precise method of conduct alleged. Your Honors asked plaintiffs' counsel to describe what the allegations were in the complaint that supported their abusive process claim. Those allegations roughly sketched out some type of agency theory. We're asserting under Horowitz, this is not an agency theory. This is a specific theory that applies when an attorney is exercising professional judgment. And based upon that theory, both Judges Billick and Garcia, over the lifespan of this case, dismissed the abusive process claims. Was that based solely on the complaint itself? Yes. Under 2615? 2615, that's right. And by way of procedure, we filed a 2619.1 when plaintiffs filed their third amended complaint. Because what they did when they filed the third amended complaint, they reactivated the abusive process counts that had been previously dismissed. So in response to that third amended complaint, we said, okay, we'll re-argue on a 615 basis that these claims that were previously dismissed, and then we'll bring summary judgment to the theories that remained against State Farm. Did you say that the real subject of this claim about the vicarious liability is that State Farm ratified this conduct? Well, under Horwich, that is one theory. Well, isn't that kind of what they're really pleading here, that it's more or less ratification, not these other? Tell me about the jury demands that were directed. Wasn't there a complete switch of making jury demands in all of these whatever 2,000 cases that they had? Jury demands? I'm not familiar with what the jury demand issue is. Doesn't the complaint allege that? I'm not familiar with what the jury demand theory is. It hasn't been briefed here. The complaint is 100 pages long. It may be in there. It's a shotgun theory. That's what we're up here for, isn't it? Right. Whether the 100-page complaint alleges abusive process if we accept all the facts in that pleading is true, which we're supposed to do at this stage, aren't we? Well, you know, when you have a shotgun pleading, when you have, you know, 100 pages of pleadings, what you have to do is see whether those pleadings, because they inevitably are inconsistent with one another, they're inevitably snapshots that don't come full circle in telling a story. The jury demand, to the extent that it's in there, is one of those fragments. Okay. Forget about the jury demands. Wasn't there an allegation about that the sheriff, that there was no service ever in any of these cases by the sheriff, that a special process server served every single complaint via a process server, and that all of those billings went to State Farm and there was, like, what, 2,000 of these things? Well, we're talking about the four claims here, and specifically with regard to the Young claim, O'Day specifically used the sheriff to try to serve Young, albeit that didn't work out, and a special process server needed to be appointed. In addition, with regard to Polk, I still am at a loss to understand what the abusive process claim is with regard to Polk, because O'Day specifically filed a motion with the trial court, the municipal trial court, and said, I can't find Polk, I would like to serve the Secretary of State, and O'Day got a specific order that said, yes, you can do that. Weren't there additional allegations, though? Wasn't this an attempt at a class action? This was an attempt at a class action. Are we accepting those allegations about the 2,000 cases that O'Day handled or not? Again, given the shotgun nature of it, I don't believe this court is obliged to accept 100 pages of allegations that are inconsistent and don't tell the story. I think we are obliged to accept the allegations and the complaint is true. This was a dismissal under 2615, and we look at it to no fault, but we accept it as true factual allegations, not legal conclusions, but factual allegations. Well, getting back to the point on the abusive process, your Honor did identify what I'll call two tranches. One is dealing with whether there are any allegations on direction, control, or authorization. I'm holding ratification off to the side for the moment. You can talk about all of them. Yes. Well, with regard to the complaint, the complaint, as I mentioned, is focused on an agency theory, and I don't believe you're going to find well-pled facts to support the allegations regarding direction, control, or authorization. Now, with regard to ratification. No, go ahead. Now, with regard to the issue of ratification, Horwitz still requires knowledge of the specific alleged wrongdoing, and you're not finding anything specific in this complaint. You're finding a lot of random allegations in that complaint that are not brought home to these four named plaintiffs, including, for example, the theory that somehow or another there's this scheme to have the, in this case, the plaintiffs, they were the defendants below, pay costs that weren't incurred. These plaintiffs never paid any costs whatsoever. They can't allege that they actually paid costs. So all of the theories that relate to this payment of costs, which is underlying the vast, vast majority of this 100 pages, is completely irrelevant to these four named plaintiffs, and that's what the scope of this 2615 motion was, was on these four named plaintiffs. In addition to the nine. The complaint says that State Farm knew that he, that O'Day was getting a special process over this private detective named Son, but that, in fact, he was using Ricky Dixon. They knew that. They looked at the files. They knew that. So they knew he was using an unauthorized or he was potentially unauthorized special process over, and I believe it also says that they were paying his invoices for Ricky Dixon. So they're saying he knew that they were, that State Farm was aware that O'Day was not doing this properly. This was, and you can read, Your Honor, the record of the actual motions to cost that are attached to the O'Day affidavit, and you can see that there are specific allegations that the plaintiffs are making in these motions that are saying that State Farm, or rather Mr. O'Day, can't use a process server unless there is the certificate number in the order. So there's a fleeting stage, right? I mean, but that's not attached to the complaint. That's something you did in presuming judgment, right? Of course. But at the same time, it goes to the issue of what the theory is. The theory here is that the process server is not proper unless you are a licensed private detective, and in the order there is a specific number of the license for that private detective. That is not the law, and that misconception undermines much of the allegations in the complaint. It wasn't the allegation made that in some of the courtrooms you had to put that you did initially try with the sheriff and that that was unsuccessful before they, in the forum motion for appointment with special process server, and that State Farm, that the judges in that division found out about Mr. O'Day, and in order to get to a courtroom where the forum did require that, they okayed filing jury demands. And in that courtroom, they didn't have to allege prior attempt with the sheriff. Right. And that was the allegation with regard to the jury demand. You've refreshed my recollection. Again, that's based on a false premise of law, which is that you do not have to allow the sheriff to serve process initially. That isn't the law. Now, some judges may say, I prefer that you use the sheriff. But that's what the complaint alleges is that some judges do require. I think you're right about the law. That's been my understanding. I know lawyers that never go to the sheriff, but they get a special process server and do it the right way. But those are probably not sub-real cases. And the complaint says that in some of these municipal divisions, maybe not courtroom 1501 in the Daly Center, but in some, you are required to show that you first went to the sheriff. And maybe to keep the cost down. I'm not sure why. And that Mr. O'Day had to not tell the truth in those affidavits. I don't believe you're going to find any of those allegations that specifically relate to these four named plaintiffs and whether there's an abuse of process claim stated with regard to these four named plaintiffs. And, in fact, again, we're looking ahead with regard to summary judgment. But at the same time, it can help frame what you're actually reviewing. Back to the summary judgment. Regardless of these four named plaintiffs, should this have been dismissed with prejudice then, if all these other allegations are considered, or should it have been without prejudice so that counsel could re-plead? Well, first of all, this would have been dismissed multiple times already. This specific count was dismissed multiple times. We're only looking at the last one. We're not looking at what happened before. Well, but that's a factor in terms of whether it's with or without prejudice. And it's also what is the state of the case. As you saw from the record, there was a lot of discovery and discovery disputes going on in this case. And the trial court, Judge Garcia, said to plaintiff's counsel, all right, what more do you need? This was in September of 2014. The case was already pending for four years. And she identified a variety of things that she needed. She got those. We promptly moved for summary judgment with regard to what I'll call the live claims, and then we moved to dismiss the brand or the renewed abuse of process claims. So that was viewed to be an ending point in this case. Everyone knew that a summary judgment motion was coming, which goes to Your Honor's point of there were no motions to compel on the key issues that we're seeing now. It's only regret after receiving a ruling that was unfavorable that now we see that, well, we should have gotten this information and we didn't. Can we talk about the motion for summary judgment? Please. So you've got two affidavits. You've got Ovede and you've got McCann. McCann says he relied on certain documents. I think they were the claim files, the activity logs within the claim files. Maybe those are one and the same. But he reviewed them, and then he had something to say about each of the four cases, about what State Farm was or was not told about the service of process, et cetera. But you didn't attach the documents to the affidavit. Then you have Ovede's affidavit, where you did attach a few documents to it, like the police reports for each of the cases. But he goes on to then recite very specific information as to each one of those four, like the dates that he told State Farm this and that, which although he doesn't actually say he's relying on documents, it sure seems like the only way he could possibly have been able to say some of this stuff he said is that he relied on documents too. But in neither case did you attach documents to their affidavits that supported this stuff. So how is that okay? So first of all, let's start with McCann. Okay. So McCann was, yes, he did review the documents. He reviewed the redacted documents. But he was looking for information that would suggest that Ovede informed him of the irregularities with service, informed him of any problems with the default judgments. There was nothing there. So there was nothing to show. So there isn't any reliance on any particular affirmative statement. It's a function of what is not there. Shouldn't those documents then be there for us to be able to review and the trial judge to be able to review whether or not what he was saying was accurate? How do you support those statements? And you say you're basing it on something you reviewed that showed that this information is not there. How can we possibly review that without knowing or seeing what that document said? First of all, these are privileged communications, and a privileged log was provided. All right. So once that happens, plaintiffs aren't allowed to see that. Now, plaintiffs have a variety of options, and those options could have included requesting an in-camera review of those documents that were logged. That wasn't done. And I should also mention, at the very beginning of this case, when we were negotiating a protective order, I asked for a specific clause in the protective order that would have allowed her to have a quick peek of those redacted claim files or the unredacted portions of the claim files so we wouldn't have had this dispute. She did not agree to that. In fact, she didn't agree to the entry of a standard protective order without that clause in it. I had to move and get that entered. So it's your position that you can take a set of documents and say, I looked at these, and these are communications between me, State Farm, and Attorney O'Day, and there's nothing in here that shows that we ever talked about service of process. And then you can turn around to the plaintiff and say, you don't get to see these documents because they're privileged. I can rely on them for summary judgment, but the plaintiff doesn't get to see them? And in this case, neither does the judge, and the judge doesn't even get to see them? I mean, you're stiff-harboring everybody because of the attorney-client privilege, even though you're using those documents to win the case? I have to say I've never heard of that. Your Honor, it goes to the at-issue doctrine, which we briefed with the trial court. But it's one thing for the plaintiff to sue you and say, okay, State Farm, let's see everything you did with O'Day. You put it at issue because you didn't put anything at issue when she did. She sued you, right? So you can very easily then say, hey, I didn't put anything at issue. I've just got an attorney, and we have a privilege. But if you're going to then use those documents offensively to get summary judgment, haven't you then put it at issue? No. Under the law, and that's what we briefed with Judge Garcia, in order to flip that, you'd have to have the burden of proof. For example, if we had an affirmative defense to that effect. Ours was there wasn't an element of the claim. Knowledge is an element of the claim. And they can't allege, they can't say you have knowledge and then say because we've made those allegations, now all of your privilege communications, which, by the way, don't directly inform knowledge because it's the absence of the information. But all of those communications are now subject to review by plaintiffs? No. No, they're not because you can just claim the privilege and you can shut her case down. But if you move for summary judgment and say, hey, Judge, look at all these documents. I win, but I'm sorry you don't get to see them, and neither do you, Ms. White. Nobody gets to see them, but take my word for it. I win because of them. That can't be the law, can it? Well, I mean, do you see the difference I'm talking about? She can't just sue you and say you guys conspired. Now show me all your communications. I get that. That I can see because you would say I didn't put anything in her lawsuit. But if you're going on offense, doesn't that flip this whole equation around? It's still defense, though. I mean, how else do you get out of the case when you have those allegations that require you to disclose the privilege communications? That's the nature of the ad issue, Doctor, that you're actually putting an ad issue where you have the burden of proof. We don't have the burden of proof here, and we were the ones placed in this situation. And by the way, we offered practical solutions to this. She could have had the quick peek. She could have moved to compel and have the court take an in-camera review. She didn't do that. The motion to compel with regard to the ad issue doctrine came up in fits and starts and never specifically framed, although Judge Garcia did deny the motion to compel without prejudice, which would have allowed her to bring that issue up if she deemed appropriate. Right. You guys had a discovery. You cited that in the letter brief. You went through all that, that there was a little bit of an ad issue litigation. It wasn't about summary judgment. It was before that. You were offering to go on camera, and you're saying she didn't actually finish the play on the string. And, Your Honor, it's also important to know that these affidavits, they were tendered before the depositions, and the depositions came before the motion for summary judgment. And then we had the trial court said, all right, what more do you need? She got what she said, which in essence is kind of the scheduling order that she suggests is not part of this case. You mean the affidavits came before the summary judgment? Yes. In what context were those affidavits handed over? There were depositions that were scheduled McCann and O'Day, and before those depositions occurred, we tendered those affidavits to plaintiff's counsel with the exhibits. With the documents attached? Well, with the documents that are currently attached, not what we're talking about with the unredacted claim. Why would you turn over affidavits to the other side for no reason? I don't understand. You do for summary judgment. In part to avoid these same arguments that there was somehow a surprise or some sort of defect, it gave her time to say, all right, you know, I took the deposition. There's more information that I need. I want to compel this. I didn't get that. So it wasn't as though the deposition was taken. Now all of a sudden we have these affidavits that are supported, and there isn't any time to rebut. These affidavits were rebutted. There was plenty of time to move to compel if there was anything that they thought was inappropriate with regard to those affidavits. Well, she did say it was inappropriate to not attach the documents that the defiance were reviewing based on Oliphant v. Robodeau and all that case law. She did say that. She said that to Judge Garcia in the oral argument. I think she said it in writing, but she certainly said it at the oral argument. But she didn't say at the time that the judge said, you know, what more do you need? And if, for example, she believed that that was a mistake, there could have been a motion to compel filed or renewed or what have you, but that didn't happen. That was the status of the record at the time. So can I just add? I mean, your brief was very good. You did a very nice job in the brief. I'm not trying to be critical, but you didn't say any of this in the brief. I mean, she was loudly complaining in her brief that you did not attach the affidavits, the exhibits to the affidavits. And it was the one thing in your – the one issue that I could find out which you were conspicuously silent. You didn't say anything in the briefs about, well, we didn't have to turn these over because we can rely on them and also shield them from everyone because you apparently have some legal theory under the ad issue doctrine. You didn't say any of that. Is there some reason why you didn't say any of that? Well, one of the main issues was space. Okay. I mean, we were jam-packed in the argument. The other, Your Honor, is – I'm not trying to come down on you. No, no. There was a space constraint. There are references to these same concepts in there. They are not all packaged in a bowl, but there are – the same concepts are stated throughout in terms of – So if this – if we agreed with counsel and we remanded the summary judgments, you'd do the same thing again. You would put forth the affidavit of McCann and say, we're letting all these exhibit these – I'm sorry – documents, but no one gets to see them, not even the judge. And then you're going to do an O'Day thing where he's going to have this miraculous memory about things that he must have looked at documents to say, but he's not going to give us those documents either, not even show the judge. Well, that's not – Are you saying you wouldn't do that differently next time? I don't think so. Not even the judge? I mean, you know, when you talk about – I mean, why do we have this affidavit rule? An affidavit is a substitute for live testimony. If you were at trial, and this case went to trial, you'd have to authenticate all the documents, right? You'd do it through a witness. The witness would take the documents and say, yes, these are business records, right? They're true and accurate copies, ordinary course of business, what have you. And then, and only then, could the witness testify about what these documents show or don't show. That's how you would do it at trial. With an affidavit, we say, okay, we'll skip the swearing in and live testimony part, but you still have to have the documents. I mean, how can the judge know, even if you somehow could not show them to counsel or could do some kind of a bifurcated in-camera thing where the judge gets to see all the documents and Ms. Wineley gets to see the redacted versions that you've already turned over. Maybe I could see that, but you didn't even do that. You don't even – I mean, how could the judge possibly know that Mr. McCann was right, that these documents supported Mr. McCann's testimony when he never saw them? Help me out with that. What am I missing? Well, first of all, let's talk about the McCann affidavit, because it was chock-full with exhibits, including very detailed timelines of what was happening in those municipal cases from which the timeline in his affidavit is built. And based upon those documents, he provided his testimony that, you know, here there's an order vacating the defaults. And then he'd say, I did not inform State Farm of this order vacating defaults. So you're talking about O'Day. O'Day. I'm sorry. I apologize. That's all right. Yes. So if you look at the O'Day affidavit, there are the documents that are attached, and they do support that testimony. And it's specific orders, motions, everything like that builds the timeline, not his underlying legal files. And he says, I didn't inform State Farm. That in and of itself supports the motion for summary judgment. What also supports the motion for summary judgment is our discovery responses to plaintiff that said, tell us the facts that support your abuse of process claim. Tell us the facts that support your conspiracy claim. There are no facts there. Those two elements alone support the motion for summary judgment. So you don't even need necessarily the McCann declaration to confirm the absence of information, with the idea being that because we've confirmed the absence of information, all of a sudden information that isn't directly relevant now needs to be produced in some fashion without a motion to compel, with ignoring our request that a protective order be entered that would allow the quick peek. We've done what we could do in order to make sure that due process was served. We've provided these affidavits ahead of time, before the depositions, and then once the court said, what more do you need? It was time to go. The record was closed. It was time for summary judgment. Thank you very much. Thank you very much. We kept you awhile. Ms. White, absolutely, please. Thank you. I will be mindful of the time and try to be very direct and succinct in this rebuttal-type argument. So I will just point out the issue on the jury demand. The court is correct. What it was was there's the allegation that on the 11th floor, which was non-jury cases in the Daly Center, Mr. O'Day was, we say, caught, for lack of a better word, and was having his motions for process over denied because he was not first going to the sheriff. And that's when it got transferred because of that. And these are small claims, so it was a $12.50 or $25 extra charge. That's all it cost him to get it out of the place where the scheme was sort of unraveling. I would also point out respectfully, Your Honor, the rule actually for service in Cook County is that it does have to go to the sheriff first. There are exceptions to that. They're usually used in matrimony cases or cases where there would be some reason that somebody would think. A rule in Cook County? It is. There's a Supreme Court rule and there's a state law. There's a Cook County ordinance or something? No, no, no. I'm talking about the state law because it's, well. Okay. Circuit court rules. No, actually, I'm really talking about 202A, the actual rule. Yeah, that's right. Right. That's state law. Exactly. But what it says is in counties with a population in excess of 3,000 people, which is the only county in the state that I'm aware of, is Cook County, you must first place with the sheriff. That is the state law. Don't ask me why Cook County. I don't think it says that. I don't think that's right. But it doesn't matter because you alleged in the county. We don't want to get hung up on that. Okay. The complaint says that the local judges in these courtrooms have rules. And that he. That's fine. I think we're okay. Okay. The other thing I would just like to mention is, as the Court indicated with regard to the claim privilege and not attaching documents, there's no exception under Robido. There's no exception in 191 that says only non-privileged documents. And once they do raise the privilege, then they want to use it for offensively to get out of the case. They waive the privilege, which is why that is a significant problem. I would just point out, 191 doesn't say except for privileged documents. Those don't have to be attached. Why didn't you take them up on the offer for the attorney's eyes only look at it? What do you call the quick peek? I don't agree with counsel's assessment of that. There were multiple negotiations with regard to the. Well, I mean, that happens, right? We do that sometimes. Well, we do. The lawyer doesn't have anything to be fighting about before they go through some World War III. Right. Well, there were other things. I'd have to go back, actually, to be perfectly honest. To my notes, I wasn't particularly. I do remember there were very expansive requests by State Farm that they wanted to keep everything under cover. And I said, no, we shouldn't have all of these things under cover. And I guess that's the best way to answer it. Okay. Because I'm not really quite sure. And I guess on that note, I will let everyone go to lunch. And thank you very much. Thank you. Thank you for the very, very fine briefing. I listened to the argument. We kept it here for a while today. We'll take it under advisement and issue an opinion soon. Thank you for your time. Thank you. We'll stand adjourned.